**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TIMOTHY PAUL HOFFMAN, JR.,** | ) | |
| **Petitioner,** | ) | **Civil Action No. 07-203 Erie** |
| | ) | |
| **v.** | ) | **Magistrate Judge Susan Paradise Baxter** |
| | ) | |
| **MARK KRESEVIG, et al.,** | ) | |
| **Respondents.** | ) | |

**OPINION AND ORDER**[1]

**I.     Introduction**

In June 2003, a jury empaneled by the Court of Common Pleas of Erie County found Petitioner Timothy Paul Hoffman, Jr., ("Petitioner" or "Hoffman") guilty of third-degree murder, aggravated assault, endangering the welfare of children, and recklessly endangering another person. The victim was fourteen-year-old Ryan Ross King, who was in the custody and care of Petitioner and his partner, Jeff Condor. Pending before this Court is his Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus and supplement thereto [Document Nos. 4 & 6]. Petitioner claims that his due process rights were violated because the evidence introduced at his trial was insufficient as a matter of law to establish that King's injuries were inflicted upon him by another person, as opposed to resulting from another cause, such as an accidental fall. He also claims that he was denied his Sixth Amendment right to effective assistance of counsel because his trial attorneys: (a) would not allow him to testify on his own behalf; and, (b) did not call Condor to testify as a defense witness. Lastly, Petitioner claims that his five-year probation sentence for endangering the welfare of children is illegal because it should have merged with his sentence for third-degree murder.

---

[1]  In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including entry of a final judgment. [Document Nos. 13 & 14].

**II.**     **Relevant Background**[2]

King was a special needs individual who functioned at the level of a one-year-old child. He required extensive personal care.  King also had several physical ailments, including respiratory problems, chronic ear infections, and severe scoliosis that required an interior/anterior spinal fusion to enable him to stand.  In June 2001, when his mother, Kathleen King, was unable to provide the necessary care for him, he moved into Petitioner and Condor's home.  They shared the responsibilities of his care.

In the late afternoon of February 21, 2002, Petitioner and King were at home together and Condor was at work.  Around 5:50 p.m., Petitioner called the paramedics and told them that King was having a seizure.  When the paramedics arrived, King was lying on the floor in a fetal position.  He was not breathing and the paramedics administered advanced life support procedures.  (6/3/03 Trial Tr. at 47-49).  The paramedics that attended the scene later testified at Petitioner's trial that they observed no physical signs of a seizure.  (Id. at 51, 74-75).  The paramedics transported King to Hamot Medical Center and he had brain surgery that day.  He died on February 23, 2002.

Forensic pathologist, Eric L. Vey, M.D., performed the autopsy.  He testified at Petitioner's trial that King died as a result of complications from blunt force trauma to the head. (6/4/03 Trial Tr. at 178).  In January 2003, the Commonwealth charged Petitioner with criminal homicide, aggravated assault, endangering the welfare of children, and recklessly endangering another person.  He retained J. Timothy George, Esq., and Timothy Lucas, Esq., to represent him.

Petitioner's six-day trial commenced on Monday, June 2, 2003, with the selection of the jury and argument on the defense motion in limine.  The next day, counsel gave their opening statements and the Commonwealth began presentation of its case.  Its theory was that Petitioner had become overwhelmed with the burdens presented by caring for King, that he at times physically abused him, and that on February 21, 2002, he inflicted the injuries upon King

---

[2]  Respondents have submitted the relevant transcripts and the original State Court Record ("SCR").  The SCR contains 63 documents and shall be cited to as "SCR No. ___ ."  Respondents also have submitted copies of the appellate briefs, which are located in the same hard-copy file that contains the indexed SCR and the transcripts.

(perhaps by shaking him) that caused the head trauma that led to his death.  In support of its theory, the prosecution called Dr. Vey.  He testified that King suffered severe brain trauma.  (Id. at 178-208).  Dr. Vey explained that although King had no external evidence of trauma to the head, "there was a plethora of internal trauma to the head[.]"  (Id. at 171).  He said that King had a closed-head injury, which is an injury sustained within the confines of the skull.  (Id. at 166).  According to Dr. Vey, this type of injury can occur without any contact between an object and a person's head.  (Id. at 167-69).  With respect to King's brain, Dr. Vey testified that he observed a subdural hematoma or blood clots and a subdural hemorrhage or bleeding on the left side as well as diffuse axonal injury ("D.A.I.").  (Id. at 178-80).  D.A.I. is a "traumatic brain injury that results in immediate loss of consciousness" and it occurs when "accelertion forces or deceleration forces are exerted on the head, causing shearing stresses and strains within the brain as the brain moves within the head."  (Id. at 181).  Additionally, Dr. Vey testified that King had hemorrhages or bleeding on both of his retinas (id. at 191), and stated that this condition results from a "rotational force that's applied through an axis that causes turning about the axis."  (Id. at 185).

Based upon the presence of the subdural hematoma, D.A.I., and two retinal hemorrhages, Dr. Vey concluded that the injuries to King's brain were not caused by natural disease process, a seizure, a fall from a couch or from the standing position, or as a result of an accident.  The basis for his opinion was his review of periodicals and textbooks in which he looked for cases in which those types of injuries had been found and the circumstances under which those injuries had been inflicted.  For example, in one article Dr. Vey noted that there had been 76 cases in which a child had suffered an accidental injury to the head and only four percent of those cases involved subdural hematomas.  (Id. at 213).  Dr. Vey also cited studies in which D.A.I. was found present in seven out of 10 cases where the injury had been non-accidental but was not observed in cases in which the injury was inflicted accidentally.  (Id. at 215).  Using a similar methodology for the retinal hemorrhages, Dr. Vey cited a study in which it was found that the "frequency of retinal hemorrhages in the inflicted, intentional injury group was 397 times higher than the frequency of retinal hemorrhages in the accidental group."  (Id. at 216).  Since his research suggested that the odds of subdural hematoma, D.A.I. and retinal hemorrhages being present in the case of an

accidental trauma were remote, Dr. Vey opined that the injuries to King's brain were not the result of an accident and hence were inflicted upon him.  (Id. at 217-18).

The Commonwealth also presented testimony from Petitioner's friends and co-workers to show that he had become overwhelmed with the duties associated with caring for King, and that he was dismayed at the strain those duties placed on his relationship with Condor.  Kim Lagana testified that in the months leading up to King's death, Petitioner had become increasingly frustrated with all of the challenges he faced in caring for King.  She also said that King hit Petitioner on occasion, which angered Petitioner.  (Id. at 42-67).  She testified that once Petitioner had stated to her that he did not want King to die "but it would be the answer to my problems."  (Id. at 54).

Lagana drove to work with Petitioner on the day King sustained his injuries.  Petitioner told her that "he had been up crying all night long and this morning because he was so upset.... [H]e was upset because...he couldn't get out of the situation that he was in with Ryan and he couldn't deal with taking care of Ryan anymore."  (Id. at 59).  After work that day, she was with Petitioner when he met Condor and King at a parking lot so that Petitioner could take King home.  During the exchange, King hit Petitioner again.  (Id. at 67).  When Petitioner got back into the car with Lagana, he was very upset and told her three times that he was "losing it" and that "I don't know what I'm going to do."  (Id. at 69-70).  Petitioner then drove Lagana to her home.  He and King went to their home and it was not long thereafter that King sustained his injuries.  When King died, Lagana contacted the hospital and reported that she believed that Petitioner may have caused King's injuries and that his death may not have been an accident.  (Id. at 74).  She gave a statement to the police and they began investigating the case as a possible homicide.  (Id. at 74-75).

Another Commonwealth witness, Douglas Hart, testified that he spoke with Petitioner on the day that King was injured and that Petitioner said that "if he could do something and get away with it, he would."  (Id. at 119).  Hart also testified that Petitioner told him that he spanked King with a hairbrush and that he learned to hit him in the head because King bruised too easily elsewhere.  (Id. at 115-16).  Two other co-workers, Sandra Buccigrossi and Wendy Barwell,

testified that Petitioner told them that he had left welts on King's buttocks after he was disciplined for hitting Petitioner in the face.  (6/3/03 Trial Tr. at 216, 241).  They also testified that during the week leading up to King's death, Petitioner's demeanor reflected frustration and despair.  (Id. at 221-22, 245).

The defense contended that King had a seizure and/or suffered from other heath issues that had caused him to fall, and that he had sustained his injuries when he fell.  It introduced testimony to support a finding that King had been experiencing health issues that affected his balance.  The defense also presented the testimony of numerous friends and family members who testified in general that Petitioner was a devoted and loving caregiver to King.  Kathleen King testified that Petitioner "love[d] on [her son Ryan] and took care of him."  (6/5/03 Trial Tr. at 195).  In response to a question on cross-examination, she testified "I don't know if I can say this comment, but [Petitioner] ... took care of my Ryan Ross, and he took my place.  He loved my son, and he took care of him just like a mother would."  (Id. at 218-19).

The defense also called three expert witnesses – a board certified pathologist, a board certified neurosurgeon, and a biomedical and a biomechanical engineer.  The pathologist, Dr. Karl William, found that it was significant that as early as three years of age King was "diagnosed on a CT Scan and an M.R.I. ... of having a shrinkage of the brain, a cerebral atrophy of the brain."  (6/6/03 Trial Tr. at 16).  This condition "predisposes people to subdural hematomas" which, when coupled with the evidence that in the days immediately preceding the injuries King was experiencing dizziness and falling, convinced Dr. Williams "that there was some traumatic event that resulted in bleeding around the brain" and that "the totality of the information indicates that that was most likely accidental."  (Id. at 18-19).  Dr. Williams further noted that in cases in which there is brain shrinkage "we find those subdural hematomas frequently from relatively minor falls" and that King's difficulty walking in the days that preceded his injury made him "particularly susceptible to falling."  (Id. at 20).  According to Dr. Williams, "[a] simple fall from a height, from a standing height, would be sufficient in this case to explain" the subdural hematoma.  (Id. at 30).

From a clinical standpoint, Dr. Williams stated that the absence of any notation in

medical records or the autopsy report of external evidence of trauma supported his conclusion that King's injuries had been sustained accidentally. (Id. at 22). The lack of such evidence was significant because in "a lot of cases of trauma, especially that are inflicted or intentional, there's some other bruising, there's some other marker, there's some other evidence of either earlier prior trauma or something that would indicate why there is the subdural hematoma." (Id.) With respect to Dr. Vey's testimony regarding the presence of retinal hemorrhages, Dr. Williams noted that this finding was not made by the neurosurgeon who examined King on the night of the injury and performed the surgery. (Id. at 33). Nor were these injuries detected in the CT scan that was taken prior to the surgery which, in turn, prompted Dr. Williams to conclude that they resulted from factors other than the trauma that caused the subdural hematoma. These factors included subdural bleeding, which Dr. Williams testified is associated with retinal hemorrhages and the brain swelling that the neurosurgeon observed during the operation. (Id. at 34-35). Dr. Williams also reviewed the microscopic slides that Dr. Vey testified revealed D.A.I. and noted that of the 40 to 45 total slides used, only one had been labeled as indicative of axonal injury and it concerned "an extraordinarily small area of the total volume of the brain." (Id. at 42). This fact led Dr. Williams to conclude that there was no evidence that King suffered axonal injuries to the extent claimed by Dr. Vey because "[t]hey were relatively few in number, and they were associated with other changes in the brain tissue[.]" (Id. at 46).

The neurosurgeon, Dr. William Diefenbach, testified that King's medical records indicated that he suffered from Noonan's Syndrome, which he stated was a condition that can cause "some type of bleeding dyscrasia or bleeding abnormality that ... needs to be addressed, especially if one undergoes surgery." (6/9/03 Trial Tr. at 12-13). Because Noonan's Syndrome makes an individual more prone to bleeding, Dr. Diefenbach stated that the existence of this condition was significant because of the relationship that it might have to the subdural bleeding that ultimately caused King's death. (Id. at 13-14). Dr. Diefenbach also viewed as significant the fact that during the afternoon of February 21, 2002, King was lethargic, had a vomiting episode, was observed holding his head, and had in the days preceding the injury experienced bouts of dizziness and falling. (Id. at 15). These factors suggested that King was suffering from raised

intracranial pressure and prompted Dr. Diefenbach to conclude that death "was a result of the malignant brain swelling and edema that took place from the pressure placed upon it from the acute subdural hematoma that had developed late that afternoon." (Id. at 16). Dr. Diefenbach stated that the force which initiated this process "was a low impact type of injury to [King's] head" and based this conclusion on "the lack of any findings at the time of his hospitalization at Hamot or from the autopsy report of any significant scalp injuries, bruising, lacerations, and also the lack of a fracture of the skull." (Id. at 16-17).

The defense also called Dr. Richard Collins as an expert in the fields of biomechanical engineering and biophysical engineering. These fields of study focus upon the application of classical engineering principles "to the very complicated phenomena that takes place in the body[.]" (6/6/03 Trial Tr. at 86). Dr. Collins examined King's medical history, the autopsy report, and police reports. (Id. at 98-100). He testified that the injuries to King's brain that caused his death were sustained when "he fell almost like a match-stick type of fall into his left side and hit his head on the floor." (Id. at 101-02). After stating his opinion, Dr. Collins explained for the jury the engineering analysis that he employed to reach his conclusions. He first explained that the brain shrinkage that was noted in King when he was three-years-old made his brain more mobile inside the skull and hence more prone to rotation during a sudden fall. (Id. at 114-15). Dr. Collins then calculated the speed at which King would have been moving just before impact as 12 miles per hour and stated that a "huge acceleration, angular acceleration" would have occurred. (Id. at 117). Using King's physical characteristics, Dr. Collins next calculated the angular acceleration that King's head would have experienced just prior to impact with the floor and concluded it was well within the range established in the medical journals for causing traumatic brain injury. (Id. at 119-20). Dr. Collins then went on to explain how the angular acceleration of the head at impact accounted for the presence of the subdural hematoma, D.A.I., and retinal hemorrhages that provided the sole basis for Dr. Vey's opinion that King's death was not the result of an accident. (Id. at 121-28).

On June 9, 2003, the jury convicted Petitioner of third-degree murder[3] and the other crimes as charged.  Afterwards, defense counsel George and Lucas withdrew and Christopher D. Warren, Esq., entered his appearance as counsel of record for Petitioner.

On July 29, 2003, the trial court sentenced Petitioner to 10-20 years incarceration for third-degree murder.  The convictions for aggravated assault and recklessly endangering another person merged for sentencing purposes with the murder conviction.  Petitioner received five years of probation for endangering the welfare of children, consecutive to his term of imprisonment.

The trial court denied Petitioner's post-sentencing motion.  (SCR Nos. 41-42).  Petitioner then filed a Notice of Appeal and his Statement Pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).  (SCR No. 46).  He contended, as he does in the instant federal habeas petition, that the evidence presented at trial was insufficient to sustain his conviction for third-degree murder.  On November 23, 2003, the trial court issued its Rule 1925 Opinion, in which it held that Petitioner's appeal was without merit.  (SCR No. 48, Commonwealth v. Hoffman, No. 3487A & B of 2002, slip op. (C.P. Erie Nov. 3, 2003)).

On September 10, 2004, the Superior Court issued a Memorandum denying Petitioner's direct appeal.  (SCR No. 50, Commonwealth v. Hoffman, No. 1683 WDA 2003, slip op. (Pa.Super. Sept. 10, 2004)).  It denied the sufficiency of the evidence claim on the merits.  (Id. at 3-7).  On February 2, 2004, the Supreme Court of Pennsylvania denied a petition for allowance of appeal.

Next, on or around January 31, 2006, Petitioner filed a *pro se* motion under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.Cons.Stat. § 9541, *et seq.*  (SCR No. 52).  Petitioner claimed, as he does in the instant federal habeas petition, that he was denied his Sixth Amendment right to effective assistance of counsel because his trial counsel (George and Lucas) did not allow him to testify on his own behalf and did not call Condor to testify as a defense witness.  The PCRA Court appointed William J. Hathaway, Esq., to represent Petitioner,

---

[3]  The trial court had charged the jury on both first and third-degree murder.

and on April 7, 2006, he filed a supplemental PCRA motion.  (SCR No. 54)

The PCRA Court presided over an evidentiary hearing on September 25, 2006.  (See PCRA Hr'g Tr.)  Petitioner testified at the hearing, as did his father, Timothy Paul Hoffman, Sr., and Condor, George, and Lucas.

On October 10, 2006, the PCRA Court issued an Opinion and Order denying PCRA relief.  (SCR No. 59, Commonwealth v. Hoffman, No. 3487A & B of 2002, slip op. (C.P. Erie Oct. 10, 2006)).  It rejected Petitioner's ineffective assistance claims on the merits.  On August 7, 2007, the Superior Court issued a Memorandum affirming the PCRA Court's decision.  (SCR No. 63, Commonwealth v. Hoffman, No. 2107 WDA 2006, slip op. (Pa. Super. Aug. 7, 2007)).  It adopted the PCRA Court's adjudication in full.  (Id. at 3).

## III.    Discussion

### A.    Standard of Review

This Court's review of Petitioner's first three habeas claims is circumscribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132 § 104, 110 Stat. 1214.  AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).  It "requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations."  Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).

As codified at 28 U.S.C. § 2254(d)(1), AEDPA restricts a federal court's authority to grant relief when, as is the case here, the state court has "adjudicated on the merits" the petitioner's federal constitutional claims.  Under § 2254(d)(1), an application for a writ of habeas corpus "shall not be granted with respect to any claim that was 'adjudicated on the merits'" by a state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  See also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Lambert, 387

-9-

F.3d at 234.

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert, 387 F.3d at 234 (quoting Williams, 529 U.S. at 405-06). "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular…case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Id. (quoting Williams, 529 U.S. at 407).

Under AEDPA, federal courts "are not authorized to grant habeas corpus relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices." Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000).  It is not enough for Petitioner to show that the state court's adjudication of any of his claims was an "incorrect or erroneous" application of United States Supreme Court precedent.  Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Instead, he must show that the state court's adjudication "cannot reasonably be justified under existing Supreme Court precedent."  Hackett v. Price, 381 F.3d 281, 287 (3d Cir.2004) (citations omitted); Waddington v. Sarausad, — U.S. — , 129 S.Ct. 823, 831 (2009) (where it is the state court's application of governing federal law that is challenged, "the state court's decision must be shown to be not only erroneous, but objectively unreasonable.") (internal citations and quotations omitted); see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold").

**B.     Sufficiency Of the Evidence Claim**

The trial court instructed the jury that in order to convict Petitioner of third-degree

murder, it had to find first that Petitioner killed King, and second that he did so with malice. (6/9/03 Trial Tr. at 138-39). Petitioner challenges the evidence the Commonwealth submitted to establish the former element. He asserts that it was insufficient as a matter of law to establish that he caused the injuries that resulted in King's death.

The "clearly established Federal law" for purposes of reviewing this claim under 28 U.S.C. § 2254(d)(1) is set forth in Jackson v. Virginia, 443 U.S. 307 (1979). In a habeas corpus proceeding, where the sufficiency of the evidence is in contention:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction .... does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt... Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Byrd, 105 F.3d 145, 147 (3d Cir. 1997) (quoting Jackson v. Virginia, 443 U.S. at 318-19) (internal citations and quotes omitted). See also Robertson v. Klem, 580 F.3d 159, 165 (3d Cir. 2009); Orban v. Vaughn, 123 F.3d 727, 731-33 (3d Cir. 1997).

In rejecting Petitioner's contention that the Commonwealth failed to present sufficient evidence of third-degree murder, the Superior Court applied the Pennsylvania equivalent of the Jackson v. Virginia standard. See Evans v. Court of Common Pleas, Delaware County, 959 F.2d 1227, 1233 (3d Cir.1992) (the test for insufficiency of the evidence is the same under both Pennsylvania and federal law). It then held:

> Hoffman alleges that there was insufficient evidence that he committed a criminal act which caused the victim's death since the Commonwealth did not establish the exact cause of death. We disagree. This Court rejected a similar argument in Commonwealth v. Hart, 501 A.2d 675 (Pa. Super. 1985). In Hart, the medical examiner was unable to state the cause and manner of the victim's death with absolute certainty, but repeatedly stated that he held his opinion with 'a reasonable degree of medical certainty.'" Id. at 677. The Hart Court noted that in Commonwealth v. Turner, 421 A.2d 1057 (Pa. 1980), the defendant admitted that he beat the two-year-old victim but denied that he inflicted the head injuries which caused the death. Hart, 501 A.2d at 678. Although the medical examiner "acknowledged the *remote* possibility that *a* contusion to the child's head *could* have been caused by a fall, he discounted that possibility." Id. (quoting Turner, 421 A.2d at 1059 (emphasis in original)). The Court in Turner concluded that "[t]he reasonable inferences arising from the evidence overwhelmingly negate the possibility of accidental head injuries." Id. (quoting Turner, 421 A.2d at 1059). The Hart Court noted that the same was true of the evidence in Hart. Thus, the Hart Court held that the evidence was sufficient to prove beyond a reasonable

doubt that the victim's death was caused by a criminal act. 501 A.2d at 678.

      Here, although the exact cause of the victim's death was uncertain, Dr. Eric Vey, a forensic pathologist, testified that the victim's injuries were the result of the intentional infliction of blunt force trauma and not the result of a natural disease, seizure or accident. N.T., 6/4/03, at 208-18. Moreover, Dr. Vey repeatedly stated that he held his opinion with "a reasonable degree of medical certainty." Id. Accordingly, in light of Hart and Turner, we find that Dr. Vey's testimony was sufficient to prove the victim's death was caused by a criminal act.

    - - -

      Lastly, Hoffman argues that the Commonwealth was required to present more than the testimony of Dr. Vey to establish sufficient evidence of causation. Here, in addition to Dr. Vey's testimony that the victim's injuries were the result of the intentional infliction of blunt force trauma and not the result of a natural disease, seizure, or accident, the Commonwealth presented the testimony of the paramedics, who stated that there were no physical signs that the victim's injuries were caused by a seizure. N.T., 6/3/03, at 51, 74. There was also evidence that Hoffman, who was the only person present when the victim was injured, N.T., 6/5/03, at 24-25, had previously left welts on the victim, N.T., 6/3/03, at 216, 241, and had learned to hit the victim in the head because he had bruised too easily elsewhere. N.T., 6/4/03, at 116. Moreover, Kim Lagana, Hoffman's friend and co-worker, testified that Hoffman was upset about having to use his vacation days to take care of the victim. Id. at 58. According to Lagana, Hoffman believed that the victim's death would be the answer to his problems. Id. at 54. Furthermore, on the day the victim was injured, Douglas Ralph Hart, another one of Hoffman's friends, stated that "if he could do something and get away with it he would," id at 119, because he was angry that he was always the one stuck taking care of the victim. Id. at 120.

      We find that Dr. Vey's testimony, along with the other evidence presented by the Commonwealth, established sufficient causation.

(SCR No. 50, Hoffman, No. 1683 WDA 2003, slip op. at 4-7).

      The Superior Court applied the correct legal standard when it evaluated this claim; therefore, its adjudication satisfies review under the "contrary to" clause of § 2254(d)(1). See Williams, 529 U.S. at 406. It's adjudication also satisfies the "unreasonably application" clause. It explained why a rational finder of fact could have found the challenged element of third-degree murder beyond a reasonable doubt, and this Court cannot conclude that its determination was "unreasonable application of" the Jackson v. Virginia standard. Dr. Vey expressed his opinion within the relevant standard of a reasonable degree of medical certainty. He opined that King's injuries were inflicted upon him by another person and were not the result of a natural disease process, seizure, sustained from falling off a couch, falling from a standing position, or an accident. (6/4/03 Trial Tr. at 208-18). Petitioner's counsel vigorously challenged his opinion and the presented the testimony of three expert witnesses to contest his testimony. It was within the

jury's province to credit Dr. Vey's testimony over the defense experts' testimonies, and this Court

may not reweigh the evidence or substitute its judgment for that of the jury.  Dr. Vey's testimony,

together with the circumstantial evidence (including but not limited to evidence that the

paramedics did not observe signs that King had a seizure, that Petitioner was the only one home

with him at the time he sustained his injuries, and the statements he made to his friends and co-

workers prior to King's death), supported the jury's third-degree murder verdict by the

constitutional minimum of evidence necessary.


### C.  Ineffective Assistance Claims

Petitioner contends that he was denied his Sixth Amendment right to effective assistance

of counsel because George and Lucas: (1) did not allow him to testify on his own behalf; and,

(2) did not call Condor to testify as a defense witness.  The "clearly established Federal law" for

AEDPA purposes in which to analyze these claims is set forth in Strickland v. Washington, 466

U.S. 668 (1984).  Under Strickland, Petitioner first must show that his trial counsels'

representation fell below an objective standard of reasonableness."  466 U.S. at 688; see also

Williams, 529 U.S. at 390-91.  The law presumes that trial counsel was effective:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction or
> adverse sentence, and it is all too easy for a court, examining counsel's defense
> after it has proved unsuccessful, to conclude that a particular act or omission of
> counsel's was unreasonable.  A fair assessment of attorney performance requires
> that every effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time. Because of the difficulties inherent
> in making the evaluation, a court must indulge a strong presumption that counsel's
> conduct falls within the wide range of reasonable professional assistance; that is,
> the defendant must overcome the presumption that, under the circumstances, the
> challenged action might be considered sound trial strategy.

Id. at 689 (internal citations and quotations omitted).  The Court of Appeals for the Third Circuit

has explained that it is "only the rare claim of ineffective assistance of counsel that should

succeed under the properly deferential standard to be applied in scrutinizing counsel's

performance."  United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997) (quoting United

States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989)).

Strickland also requires Petitioner to show that he was prejudiced by his trial counsels' alleged deficient performance.  "This requires showing that counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687.  In other words, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

**1.     Background**

In order to properly review Petitioner's allegations of ineffective assistance, some background as to what occurred at trial and during the PCRA hearing is necessary.  At trial, near the end of the defense's presentation of its case, the trial court conducted a colloquy with Petitioner to confirm his decision not to testify on his own behalf and not to call any additional witnesses other than those presented:

| The Court: | Now, the decision whether or not to testify in a criminal case has to be your decision and yours alone; do you understand that? |
|---|---|
| The Defendant: | Yes. |
| The Court: | Mr. George and Mr. Lucas can advise you one way or another whether to testify or not, but that's all they can do is advise you.  And you're free to accept their advice or reject their advice and make your own decision, because you need to make your own decision whether or not to testify.  Do you understand that? |
| The Defendant: | Yes. |
| The Court: | And I don't want to know what they've told you, but you've discussed with them whether or not to testify in this trial? |
| The Defendant: | Yes I have. |

---

| The Court: | ... So you understand about your willingness and ability to testify? |
|---|---|
| The Defendant: | Yes. |
| The Court: | Okay.  Have you reached your decision whether or not to testify? |
| The Defendant: | Yes, I have.... No, I don't feel I need to testify. |
| The Court: | All right.  Are there any other witnesses – what I hear your |

|                  | counsel telling me is that Dr. Diefenbach is the remaining expert witness, correct?                        |
|------------------|----------------------------------------------------------------------------------------------------------|
| The Defendant:   | Uh-huh, yes.                                                                                               |
| The Court:       | Are there any other witnesses you want called at this trial?                                               |
| The Defendant:   | Not that I can think of, no.                                                                               |
| The Court:       | Any other witnesses you presented to your counsel that haven't been called or that you want to call?      |
| The Defendant:   | No.                                                                                                        |

(6/6/03 Trial Tr. at 159-62).  After this colloquy, the trial continued for the weekend.

The following Monday, the court held an in-chambers discussion regarding whether the defense could introduce the recording of the 911 call that Petitioner had made on February 21, 2002. (6/9/03 Trial Tr. at 3).  Mr. George stated:

> The Court will recall that the Commonwealth played a videotaped statement of Mr. Hoffman taken at or after midnight on the day of the accident. And in that videotaped statement, I believe it's Chief Johnson who says, "Hey, look, you know, we are not seeing any emotions from you, doesn't seem like you're upset," to which Mr. Hoffman replies, "I have been crying."
>
> That's been a theme of the case, the lack of emotion.  I want to display the 9-1-1 tape as an exception to the hearsay rule, not to offer the substance for the truth of the matter asserted, but to show the present sense impression close in time to the accident.

(Id.)  The Commonwealth objected, arguing that "[t]he defense is not permitted to call witnesses or present evidence where it gets out the defendant's version of events without me having the opportunity to cross-examine him.... This would basically be allowing them to call the defendant without me getting to cross-examine him." (Id. at 3-4).  The court sustained the Commonwealth's objection.  (Id. at 4).

At the PCRA hearing, Petitioner stated that if his counsel had explained to him that the 911 recording would be admissible if he testified, he would have changed his mind and taken the stand.  (PCRA Hr'g Tr. at 8-13).  Petitioner also claimed that he instructed his counsel to call Condor, but that they did not follow his instruction.  (Id. at 6-8).

Condor testified at the PCRA hearing that he had actively participated in the defense preparation and that George had prepped him in anticipation that he would be called as a defense

witness.  According to Condor, counsel changed their minds and decided not to call him after

King's mother, Kathleen, testified favorably for the defense.  Condor testified at the PCRA

hearing that if he had been called as a defense witness, he would have stated that Petitioner

provided King with loving care and that he had observed no evidence that Petitioner had abused

King.  (Id. at 53-55).

Attorney George testified next at the PCRA hearing and responded to Petitioner's

allegations.[4]  He explained:

> At the beginning [of trial preparation] it seemed perfectly appropriate to have Jeff
> Condor be a principle witness for the defense because he was a person who was
> aware of Ryan's special medical needs.  Mr. Condor was also aware of Tim
> Hoffman and his character as well as what occurred during the course of their care
> for Ryan.  However, when we received in the course of discovery video taped
> statements ... we had to reconsider based upon the sort of things that Mr. Condor
> told the police on both occasions which as the case was coming together from our
> prospective undermined our theory [that King's death was the result of him falling
> or a fall triggering a seizure which resulted in his death].

(Id. at 87-88; see also id. at 89).  He then listed the topics upon which Condor's videotaped

statements would undermine Petitioner's defense and/or bolster the Commonwealth's theory of

the case.  (Id. at 88).

George stated that he and co-counsel decided that if they called Condor, they risked

providing the prosecution with the opportunity to establish that Petitioner had abused King and

had hid the extent of the abuse from Condor.  George noted that Condor had told the police in his

videotaped statements that Petitioner had hit King on only one occasion, but Petitioner in fact

had admitted to the police that he had hit King on three occasions.  (Id. at 89).  Condor's

videotaped statements also showed that he was "completely unaware" that Petitioner had hit King

with a hairbrush, which was another thing that Petitioner had admitted to the police.  (Id. at 89-

90).

George further explained that another concern he and Lucas had with putting Condor on

the stand was that his testimony would undermine the defense's attempt to show that the bruises

---

[4]  Lucas's PCRA hearing testimony corroborated George's testimony in all respects.  (See PCRA Hr'g Tr. at
119-26).

King had on his body had been caused when he had blood drawn days before his injuries.  In his videotaped statement, Condor told the police that he was not aware of any bruising on King's body.  If he testified, the Commonwealth would have had the opportunity to show that the bruising had not been caused by medical procedures, since Condor had been in close contact with him after his blood was drawn and would have noticed the bruising.  (Id. at 90-92).

George also explained that Condor had told the police in his videotaped statement that in the days leading up to his death, King had been happy and healthy.  His statements contradicted the defense's theory that King's medical condition had been worsening in the days before his death.  (Id. at 92-93).

Finally, George stated that Petitioner steadfastly refused to testify at his trial because "he could not handle [it]."  (Id. at 95).  George said that he recommended to Petitioner that he testify, and that he even called Petitioner's father to help convince Petitioner to take the stand.  (Id. at 96-97).  During George's PCRA testimony, the Commonwealth introduced as an exhibit a memorandum that George wrote approximately one month before the trial, in which he memorialized his efforts to get Petitioner to testify and in which he explained that Petitioner rejected his advice.  (Id. at 97-100).

In its post-hearing Opinion, the PCRA Court determined that Petitioner's hearing testimony was "not credible in its entirety[,]" and that George's PCRA testimony was credible. (SCR No. 59, Hoffman, No. 3487A & B of 2002, slip op. at 3-9).  It rejected outright Petitioner's contention that he would have testified at his trial if he had known that doing so would have enable his defense to introduce the 911 recording.  (Id. at 6-9).  It observed:

> Because Petitioner opted not to challenge all of the damaging evidence from the Commonwealth which Petitioner could best rebut [including but not limited to the testimony from his friends and co-workers that he hit Petitioner and was despondent just before King sustained his injuries] it is not credible to believe the inadmissibility of the 911 tape would have caused Petitioner to suddenly reverse nearly eleven months of refusing to testify.  In other words, if Petitioner was not moved to testify about more damaging evidence against him, it is not sensical [sic] to believe that he would have testified simply because of the 911 tape.
> - - -
> [T]his Court finds the Petitioner's decision not to testify was a knowing and voluntary decision he made which was not compelled or coerced by his counsel.  To the contrary, Attorney George was encouraging Petitioner to testify. Petitioner's decision not to testify was consistent with his steadfast reluctance to

testify in the months of pre-trial preparation.

(Id. at 9).

In disposing of Petitioner's claim that trial counsel should have called Condor, the PCRA

Court listed all of the points upon which Condor's potential testimony would have been

detrimental to the defense and then concluded:

> The reality is that a decision had to be made whether Jeff Condor's testimony at
> trial would be more harmful than beneficial.  Clearly, there were benefits to
> Condor's testimony.  However, these benefits were in large part presented by other
> witnesses.  By contrast, there were a host of devastating statements by Condor
> which seriously undercut the defense theory of the case and added to the
> Commonwealth's case....
>      ... Given the record, this Court finds that Attorney George had a
> reasonable basis for not calling Jeff Condor as a witness.  Further, this Court finds
> there is not a reasonable probability that the outcome of Petition[er]'s trial would
> have been different had Jeff Condor testified.

(Id. at 13).

### 2.    Discussion

In reviewing Petitioner's ineffective assistance claims under AEDPA, this Court must

look to the above-cited PCRA Court's adjudication, as the Superior Court adopted that court's

decision in full.  (SCR No. 63, Hoffman, No. 2107 WDA 2006, slip op. at 3).  The PCRA Court

applied the correct legal standard when it evaluated these claims and therefore its adjudication

satisfies review under the "contrary to" clause of § 2254(d)(1).  See Williams, 529 U.S. at 406;

Werts, 228 F.3d at 202-04.

The PCRA Court's adjudication also was not an "unreasonable application of" Strickland.

Importantly, this Court must to defer to the credibility determinations it made after the

evidentiary hearing.[5]  See Rompilla v. Horn, 355 F.3d 233, 252-53 (3d Cir. 2004), *rev'd on other*

*grounds sub nom.*, 545 U.S. 374 (2005); Weeks v. Snyder, 219 F.3d 245, 259 (3d Cir. 2000).

Based upon the PCRA Court's determinations, Petitioner cannot show that he would have

---

[5]  The Court is mindful that deference to state court factual finding "does not imply abandonment or
abdication of judicial review, nor does it by definition preclude relief.  A federal court can disagree with a state court's
credibility determination and, when guided by AEDPA, conclude [28 U.S.C. § 2254(d)(2)] the decision was
unreasonable or that [under 28 U.S.C. § 2254(e)(1)] the factual premise was incorrect by clear and convincing
evidence."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

testified on his own behalf if counsel had informed him that that would enable the 911 recording to be introduced into evidence.  The PCRA Court expressly rejected his testimony on this point and there is no basis for this Court to disturb its credibility determination.

Petitioner's claim that his trial counsel were ineffective for failing to call Condor as a defense witness likewise lacks merit.  At the PCRA hearing, both George and Lucas articulated objectively reasonable bases for why they did not call Condor.  Their decision is precisely the type of strategic choice that a court may not second guess.  See, e.g., Strickland, 466 U.S. at 690 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); see also Thomas v. Varner, 428 F.3d 491, 500 (3d Cir. 2005) ("where it is shown that a particular decisions was, in fact, an adequately informed strategic choice, the presumption that the attorney's decision was objectively unreasonable becomes 'virtually unchallengeable.'").  Moreover, as the PCRA Court concluded, considering that much of Condor's potential testimony would have been repetitive of that which was provided by other defense witnesses, and that calling him would have exposed him to detrimental cross-examination, Petitioner has failed to show that there is a reasonable probability that the outcome of the trial would have been different if Condor had testified.  Thus, Petitioner was not prejudiced by his trial counsels' decision.

### C.     Illegal Sentence Claim

In his final claim, Petitioner contends that his five year probationary sentence on his conviction for endangering the welfare of children is illegal because it should have merged with his third-degree murder conviction.  (See *Supplemental Petition* [Document No. 6] at 17).  Petitioner is not entitled to habeas relief on this claim for several reasons.

First, it is in direct contravention with the following statement made at the sentencing hearing by his counsel at the time, Christopher Warren, Esq.:

> It's also my belief that the aggravated assault and the reckless endangerment of another person convictions merge with the homicide conviction for purposes of sentencing.  *But the endangerment of the welfare of a child, because it requires proof of an element that the homicide offense does not, clearly the violation of a duty of care owed to the child, does not merge for purposes of sentencing.*

-19-

(Sentencing Hr'g Tr. at 7 (emphasis added)).  Second, Petitioner failed to exhaust this claim in state court and as a result it is procedurally defaulted.  See 28 U.S.C. § 2254(b)(1)(A); O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1991); Lines v. Larkin, 208 F.3d 153, 166 (3d Cir. 2000) (when exhaustion of a claim now would be futile because the state court would deem it to be waived or untimely, the claim is procedurally defaulted for federal habeas review).  Third, even if Petitioner could overcome his default, the Court would deny this claim because it is not cognizable in federal habeas.  In order to obtain habeas relief, a petitioner must demonstrate that his federal constitutional rights were violated, 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), and the doctrine of merger is a state law issue.  See, e.g., United States ex rel. Morton v. Brierley, 299 F.Supp. 95 (E.D. Pa. 1969); Barrett v. Patrick, No. 05-370, 2006 WL 2077019 (W.D. Pa. July 24, 2006) (Gibson, J.) (adopting as the opinion of the court the magistrate judge's report and recommendation in which it was held that to the extent that the petitioner was challenging his conviction as being violative of the Pennsylvania legal doctrine of merger, his claims were not cognizable in federal habeas); Daniels v. Rafferty, No. 88-151, 1989 WL 76497 (D.N.J. July 10, 1989) (holding New Jersey's merger doctrine to be purely a matter of state law).

   **D.    Certificate of Appealability**

   28 U.S.C. § 2253 governs the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition.  It provides that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  Where the federal district court has rejected a constitutional claim on its merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[.]"  Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  Applying this standard here, jurists of reason would not find it debatable whether the claims raised in the Petition For a Writ Of Habeas Corpus and supplement thereto are without merit.  Accordingly, a

certificate of appealability should be denied.

**IV.    CONCLUSION**

       For the foregoing reasons, the claims raised in the Petition For a Writ Of Habeas Corpus and supplement are denied and a certificate of appealability is denied.  An appropriate Order follows.


                          /s/ Susan Paradise Baxter
                          SUSAN PARADISE BAXTER
                          United States Magistrate Judge

Dated:  March 17, 2010

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TIMOTHY PAUL HOFFMAN,**     ) | |
|        **Petitioner,**     ) | **Civil Action No. 07-203 Erie** |
|               ) | |
|     **v.**     ) | **Magistrate Judge Baxter** |
|               ) | |
| **MARK KRESEVIG, et al.,**     ) | |
|        **Respondents.**     ) | |

## ORDER

AND NOW, this 17th day of March, 2010;

IT IS HEREBY ORDERED that the Petition For a Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 and supplement thereto [Document Nos. 4 & 6] are denied and a certificate of appealability is denied.  The Clerk of Courts is directed to close this case.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge